IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**UNITED STATES OF AMERICA,**

    v.                                                    **Criminal Case No. 3:25cr5**

**DESMOND MIKAL HAWKINS,**

    **Defendant.**

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Desmond Mikal Hawkins's Motion to Suppress Evidence (the "Motion to Suppress" or "Motion"). (ECF No. 18.)[1] In the Motion, Mr. Hawkins contends that the police obtained evidence pursuant to an unlawful seizure in violation of the Fourth Amendment of the United States Constitution.[2] (ECF No. 18, at 8.) For the reasons that follow, the Court will deny the Motion to Suppress. (ECF No. 18.)

### I. Procedural History and Findings of Fact

#### A. Procedural History

On January 10, 2025, the United States issued a criminal complaint charging Mr. Hawkins with one count of Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1, at 1.) An arrest warrant was issued the same day. (ECF No. 2.) Mr. Hawkins was arrested and had his initial appearance on January 21, 2025. (ECF No. 4.) On

---

[1] The Court employs pagination assigned by the CM/ECF docketing system.

[2] The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

the same day, a grand jury indicted Mr. Hawkins on one count of Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1). (ECF No. 7, at 1.) On February 20, 2025, Mr. Hawkins filed the Motion to Suppress. (ECF No. 18.) The United States responded to the Motion to Suppress, and Mr. Hawkins replied. (ECF Nos. 20, 25.) On April 7, 2025, the Court heard evidence and oral argument, after which the Court took the matter under advisement. (ECF No. 29.)

**B.    Findings of Fact**

On August 10, 2024, shortly before midnight, Officer Thomas Michaels and three other Richmond Police Department ("RPD") officers[3] were on patrol in the Shockoe Bottom area in Richmond. (ECF No. 30 ("Tr.") 9:24–10:4; 24:21–24.) The officers were part of the third precinct's Focused Mission Team (FMT) tactical unit. (Tr. 8:13–16.) They were patrolling the area on foot at the direction of command staff due to recent shootings and past violence in the area. (Tr. 10:3–21.) The officers were in uniform, displaying their badges, and carrying weapons in their holsters. (Tr. 14:19–25; 24:2–3.)

As the officers were walking down the sidewalk parallel to 18th street, Mr. Hawkins was walking on the same sidewalk toward them. (Tr. 15:22–16:2; Gov. Ex. 1, at 23:45:43–50.) When Officer Michaels first saw Mr. Hawkins, at least three parked vehicles separated them. (Tr. 43:20–44:7; Gov. Ex. 1, at 23:45:43.) There were no other individuals on the sidewalk between Mr. Hawkins and the officers. (Gov. Ex. 1, at 23:45:43.) Officer Michaels noticed an unusual bulge on Mr. Hawkins's right hip that he believed was a concealed firearm. (Tr. 17:14–18; Gov. Ex. 1, at 23:45:43.) Officer Michaels credibly testified that as Mr. Hawkins "got closer,

---

[3] The other RPD officers were Officers Buraliev, Finch, and Murray. (ECF No. 30, at 11:4–7.)

2

it was very apparent that there was what I believed to be a firearm concealed under his shirt, just based on how large the bulge was and how it was taut on the T-shirt." (Tr. 18:2–5.) He further testified that his belief was based on "where the location is and how the shirt is sort of outlining the back end of the gun as it's caught on it." (Tr. 19:2–4.) Officer Michaels testified that the bulge was not consistent with a bulge that would be created from a phone.[4] (Tr. 45:21–25.) The video of the encounter accords with Officer Michaels's testimony, plainly showing a large and awkwardly shaped bulge under Mr. Hawkins's shirt—one far too large to be a cell phone or a wallet. (Gov. Ex. 1, at 23:45:56.)

The officers approached Mr. Hawkins, and Officer Michaels asked Mr. Hawkins if he had a concealed weapon permit. (Tr. 19:9–13; Gov. Ex. 1, at 23:45:49–55.) At least two of the officers positioned themselves in front of Mr. Hawkins, and at least one officer walked behind Mr. Hawkins. (Tr. 32:10–12; 33:8–10; Gov. Ex. 23:45:55–57.) The video shows that Officer Michaels reached out and touched Mr. Hawkins's arm.[5] (Gov. Ex. 23:45:55.) Mr. Hawkins answered, "Yes, it's in the car," and turned away from the officers and took a step "towards

---

[4] On cross examination, Officer Michaels affirmed that he had a "hunch" that the bulge was a gun. (Tr. 46:22–24.) However, on re-direct examination, Officer Michaels explained that he believed the bulge on Mr. Hawkins's right hip was a gun because of "where it was and the size of it and how it was caught on the T-shirt", explaining that "it protruded from [Mr. Hawkins's] waist more than . . . a cell phone would." (Tr. 54:15–22.) The Court does not conclude that Officer Michaels acted on a mere hunch.

[5] Officer Michaels testified that he did not physically touch Mr. Hawkins's arm at timestamp 23:45:55 of the Government's Exhibit 1, although he acknowledged that "[i]t looks like I got close." (Tr. 20:10–12; 32:1–4; Gov. Ex. 23:45:55.) The Court finds that, based on the video evidence, Officer Michaels did touch Mr. Hawkins at this moment. (Gov. Ex. 1, at 23:45:55.) This inconsistency does not render Officer Michaels's testimony otherwise incredible. The video can be (and was) stopped and started repeatedly, which can allow conclusions based on a second-by-second analysis in contrast to what occurs, and actors experience, in real time.

Broad Street." (Tr. 20:13–21:9.) At that moment, Officer Michaels grabbed Mr. Hawkins's arm. (Tr. 38:21–22; Gov. Ex. 1, at 23:45:58.) Mr. Hawkins stood still. (Tr. 38:21–39:16.)

The other officers surrounded Mr. Hawkins and placed him in handcuffs. (Tr. 21:15–18.) Officer Finch retrieved a firearm from Mr. Hawkins's right hip. (Tr. 22:5–9.) After the officers placed Mr. Hawkins in handcuffs, he told Officer Buraliev that he was a convicted felon. (Tr. 56:11–17.)

### C. Summary of the Argument in the Suppression Motion

In his Motion to Suppress, Mr. Hawkins contends that the RPD officers violated his Fourth Amendment right against unreasonable seizures by detaining him without reasonable, articulable suspicion that he was engaged in criminal activity. (ECF No. 18, at 2, 5, 7–8.) Mr. Hawkins asserts that "[b]esides the alleged bulge on his waistband, the officers that initiated the stop did not observe any behavior suggesting the concealed possession of a gun was illegal or of any other wrongdoing." (ECF No. 18, at 8.) To remedy this violation of his Fourth Amendment rights, Mr. Hawkins seeks to exclude the firearm obtained during the unreasonable seizure and accompanying evidence. (ECF No. 18, at 1.)

### D. Standard of Review

"The proponent of a motion to suppress has the burden of establishing that his [or her] own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978); *see also United States v. Bowman*, 106 F.4th 293, 300 (4th Cir. 2024) ("the defendant bears the burden of proof on a motion to suppress"). "[T]he

controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n. 14 (1974).

## II.  Analysis

The Court will deny Mr. Hawkins's Motion to Suppress. (ECF No. 18.) The RPD officers had reasonable, articulable suspicion that Mr. Hawkins was carrying a concealed firearm. Thus, the Court will deny the Motion to Suppress the firearm and accompanying evidence obtained from the seizure.

### A.  Mr. Hawkins Was Seized Under the Fourth Amendment

#### 1.  Legal Framework:  Seizure by Show of Authority

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Fourth Amendment's protections, however, "do[] not extend to all police-citizen encounters." *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015) (quoting *United States v. Jones*, 678 F.3d 293, 298–99 (4th Cir. 2012)). "[O]nly when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). When physical force is absent, "a seizure requires both a 'show of authority' from law enforcement officers and 'submission to the assertion of authority' by the defendant." *Id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis omitted)).

To determine whether law enforcement officers have displayed a show of authority sufficient to implicate the Fourth Amendment, a court applies the objective test outlined in *Mendenhall*, 446 U.S. 544. *Id.* "The police have done so 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that [they

5

were] not free to leave.'" *Id.* (quoting *Mendenhall*, 446 U.S. at 554). Cases in the United States Court of Appeals for the Fourth Circuit "have enumerated six broad, non-exclusive categories of facts that may be relevant" to a court's analysis of the circumstances surrounding the incident: (1) how many officers were present; (2) whether officers were in uniform and/or displayed firearms; (3) whether any officer touched the defendant or made any attempt to block or restrain his movement; (4) whether the officer's questioning was conversational rather than intimidating; (5) whether the officer informed the defendant that the officer suspected [the defendant] of illegal activity, or treated the encounter as routine; and, (6) whether the officer asked for identification and how quickly the officer returned it to the defendant. *United States v. Cloud*, 994 F.3d 233, 242–43 (4th Cir. 2021) (citing cases).

For a seizure to occur, "the defendant must actually submit to [the law enforcement officer's] show of authority." *Cloud*, 994 F.3d 233 at 242 (citing *Stover*, 808 F.3d at 995). "That submission need not be explicit; it can take the form of 'passive acquiescence.'" *Id.* When determining whether a defendant has submitted to a show of authority through "passive acquiescence, the relevant test . . . is that enunciated in *Mendenhall*." *Stover*, 808 F.3d at 995–96 (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007) (internal quotation marks omitted)). "[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing [person] is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Brendlin*, 551 U.S. at 262 (finding that the passenger of a stopped car "had no effective way to signal submission while the car was still moving on the roadway, but once it came to a stop he could, and apparently did, submit by staying inside").

### 2. The Court Concludes that Mr. Hawkins Was Seized at 23:45:55 when Officer Michaels First Touched His Arm

Upon review, the Court concludes that Mr. Hawkins was seized at timestamp 23:45:55 of Government's Exhibit 1 based on at least four of the six *Cloud* factors. *See Cloud*, 994 F.3d 233, 242–43. Regarding the first *Cloud* factor, there were four police officers present who were involved in the interaction with Mr. Hawkins. Regarding the second *Cloud* factor, all four officers were in uniform and displaying their badges. As to the third *Cloud* factor, Officer Michaels reached with his right hand and touched Mr. Hawkins's left arm.[6] Finally, as to the fifth *Cloud* factor, Officer Michaels questioned Mr. Hawkins within seconds of the interaction regarding whether he had a concealed weapons permit, evincing that he suspected Mr. Hawkins of illegal activity. Thus, under the totality of the circumstances, Mr. Hawkins was seized when Officer Michaels reached his hand out to Mr. Hawkins at timestamp 23:45:55 of Government's Exhibit 1.

### B. The Seizure of Mr. Hawkins Did Not Violate the Fourth Amendment Because Officer Michaels Had Reasonable, Articulable Suspicion that Mr. Hawkins Was Carrying a Concealed Firearm

The seizure of Mr. Hawkins was lawful at its inception because it was supported by reasonable, articulable suspicion that Mr. Hawkins was carrying a concealed firearm. Officer Michaels testified that in his four years of experience as a police officer, he had been involved in between 50 and 100 investigations involving firearms. (Tr. 9:6–12.) He testified that of those investigations, he asked about a concealed weapons permit in about 50 of them. (Tr. 53:5–15.) In approximately 10 of those cases, the person possessed a valid concealed weapons permit to

---

[6] As previously discussed, the Court finds that based on the video evidence, Officer Michaels touched Mr. Hawkins's arm at timestamp 23:45:55 of the Government's Exhibit 1, despite Officer Michaels's testimony that he did not physically touch Mr. Hawkins's arm at that moment.

7

show. (Tr. 57:5–14.) In only about 5 of the investigations, the person was not, in fact, carrying a gun. (Tr. 57:15–18.)

Officer Michaels, an experienced police officer, credibly testified that he saw Mr. Hawkins walking down the sidewalk, late at night, with an unusual bulge on his right hip concealing what the officer "believed to be a firearm . . . based on how large the bulge was and how it was taut on the T-shirt." (Tr. 18:2–5.) The video of the encounter plainly shows a large bulge under Mr. Hawkins's shirt—one far too large to be a cell phone or a wallet. (Gov. Ex. 1, at 23:45:56.) Thus, under these circumstances, Officer Michaels had a reasonable, articulable suspicion that Mr. Hawkins was carrying a concealed weapon.

### 1. Legal Framework: Investigatory Stops

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The Fourth Amendment's "protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry*, 392 U.S. at 9). These protections allow an officer to lawfully stop and briefly detain a person for investigative purposes (a "*Terry* stop") when the officer has a "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *Terry*, 392 U.S. at 27 ("there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual").

"Reasonable suspicion" is a "less demanding standard than probable cause and requires a showing considerably less than a preponderance of the evidence." *Wardlow*, 528 U.S. at 123. To satisfy the standard, an officer need only "point to specific and articulable facts, which, taken

together with rational inferences from those facts, reasonably warrant th[e] intrusion." *Terry*, 392 U.S. at 21. The suspicion must also be objectively reasonable based on those facts. *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

To determine whether an officer had such a specific, articulable, and objective basis to "'suspect[] legal wrongdoing,' 'reviewing courts . . .must look at the totality of the circumstances of each case'" based on the facts known to the officer at the time of the seizure. *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018) (quoting *Arvizu*, 534 U.S. at 273). The facts available at the time of the seizure "must be seen and weighed . . . as understood by those versed in the field of law enforcement." *Cortez*, 449 U.S. at 418 (finding that objective facts that would be meaningless to the untrained, afford a legitimate basis for suspicion when used by trained law enforcement officers); *see also Arivzu*, 534 U.S. at 273 (stating that officers can "draw on their own experience and specialized training to make inferences from and deductions about cumulative information available to them that 'might well elude an untrained person'").

Reasonable articulable suspicion "does not deal with hard certainties, but with probabilities," so "an officer's articulated facts must in their totality serve to eliminate a substantial portion of innocent travelers before reasonable suspicion will exist." *United States v. McCoy*, 513 F.3d 405, 413 (4th Cir.), *cert. denied*, 553 U.S. 1061 (2008) (each of an officer's articulated facts *on its own* is not required to eliminate every innocent traveler and establish reasonable suspicion). Courts apply "commonsense and [a] contextual approach in evaluating the validity of an investigatory detention." *United States v. McBride,* 676 F.3d 385, 392 (4th Cir. 2012).

While an officer's "mere hunch," *Arivzu*, 534 U.S. at 274, or reliance on an uncorroborated anonymous tip, *United States v. Brown*, 401 F.3d 588, 595–96 (4th Cir. 2005),

9

insufficiently supports "reasonable suspicion," the standard is not a particularly onerous one. *See, e.g., McCoy*, 513 F.3d at 412–13 (experienced officer's observation of vehicles moving between parking lots where drug sales had previously occurred and without occupants entering the stores sufficient to constitute reasonable articulable suspicion).

### 2. As a Threshold Matter, RPD Officers' Reasonable Articulable Suspicion that Mr. Hawkins Possessed a Concealed Firearm Can Justify His Stop Under Virginia Law

Mr. Hawkins contends that the RPD Officers' suspicion that he possessed a concealed firearm is not enough for a reasonable articulable suspicion undergirding a *Terry* stop because, under Virginia law, the concealed possession of a gun is not illegal. (ECF No. 18, at 6–8; ECF No. 25, at 5.) In support of that assertion, he cites an inapplicable decision from the United States District Court for the Northern District of Illinois in which the court states that "[i]n jurisdictions where citizens can legally carry concealed weapons, the mere presence of a concealed weapon, without more, cannot support a reasonable suspicion that the suspect is illegally carrying that gun." *United States v. Jones*, 708 F.Supp.3d 1365, 1375 (N.D. Ill. 2023).

Significantly, under Illinois law, having a concealed carry permit is an *exception* to the unlawful use of weapons statute. 720 Ill. Comp. Stat. 5/24-1 (stating that the prohibition on carrying a concealed weapon "does not apply to or affect transportation of weapons that . . . are carried or possessed . . . by a person who has been issued a currently valid license under the Firearm Concealed Carry Act[.]") In contrast, under Virginia law, a valid concealed carry permit is merely an affirmative defense to a violation of the statute prohibiting the concealed carry of a weapon. Va. Code § 18.2-308(A) (stating that "[i]t shall be an affirmative defense to a violation of clause (i) regarding a handgun, that a person had been issued, at the time of the offense, a valid concealed handgun permit.")

10

Indeed, the Supreme Court of Virginia rejected a similar argument to that advanced by Mr. Hawkins in the case at bar. In *Whitaker v. Commonwealth*, the defendant argued that "[i]t is not a crime to possess a weapon . . . and without verification that [the defendant] did not have a weapons permit the police lacked probable cause to arrest him for violating the concealed weapons statute." 687 S.E.2d 733, 738 (Va. 2010). The Supreme Court of Virginia disagreed, holding that "[t]he fact that [the defendant] might not have been convicted on the concealed weapons charge at a later trial on a showing he had a permit does not affect the viability of the probable cause to arrest in the first instance." *Id.*

Courts in this district have reached the same conclusion. *See United States v. Butler*, No. 2:20cr044 (DJN), 2020 WL 7777476, at *6 (E.D. Va. Dec. 30, 2020) (holding that, under the totality of the circumstances, officers had reasonable articulable suspicion such that they could investigate the lawfulness of the defendant's possession of a firearm).[7] Further, the Fourth Circuit has cited the Virginia concealed carry statute in upholding the denial of a motion to suppress, finding that a deputy's observation of a "previously concealed pistol" in plain sight on the floorboard of a truck supported reasonable articulable suspicion because "the deputy immediately recognized [it] as potential evidence of a crime." *United States v. Rumley*, 588 F.3d 202, 206 (4th Cir. 2009).

The Court therefore must reject Mr. Hawkins's argument and concludes that the RPD Officers' reasonable articulable suspicion that Mr. Hawkins possessed a concealed firearm can, as a matter of law, justify Mr. Hawkins's stop under Virginia law.

---

[7] The court distinguished this from the United States Court of Appeals for the Fourth Circuit's decision in *United States v. Black*, involving North Carolina law, in which the court held that "where a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention.") 707 F.3d 531, 540 (4th Cir. 2013).

11

### 3. Officer Michaels Had Reasonable Articulable Suspicion that Mr. Hawkins was Carrying a Concealed Weapon Because He Observed an Unusual Bulge on His Right Hip Consistent With the Officer's Experience of People Concealing Firearms

Officer Michaels had reasonable articulable suspicion to seize Mr. Hawkins because he observed an unusual bulge on Mr. Hawkins's right hip that was consistent with Officer Michaels's experience of concealed firearms. (Tr. 17:14–18; Gov. Ex. 1, at 23:45:43.) He credibly testified that the bulge he observed on Mr. Hawkins's hip was inconsistent with one that might be created by a cell phone and that he believed it was a gun based on "where the location is and how the shirt is sort of outlining the back end of the gun as it's caught on it." (Tr. 19:2–4.) . Further, Officer Michaels testified that in his four years of experience as a police officer, he had been involved in between 50 and 100 investigations involving firearms. (Tr. 9:6–12.)

Consideration of the "the totality of the circumstances," as understood by those versed in the field of law enforcement, reveals that Officer Michaels had a reasonable, articulable suspicion that Mr. Hawkins was carrying a concealed firearm, which supported the investigatory action. *Kehoe*, 893 F.3d at 237 (quoting *Arvizu*, 534 U.S. at 273); *Cortez*, 449 U.S. at 418. The Court will address the relevant factors in turn.

#### a. Officer Michaels's Observations at the Scene Merit Substantial Weight, Especially Given Body Camera Confirmation

Officer Michaels observed Mr. Hawkins walking toward him and the other three officers on the sidewalk with an unusual bulge on his right hip that Officer Michaels believed was a concealed firearm. (Tr. 17:14–18; Gov. Ex. 1, at 23:45:43.) Specifically, Officer Michaels credibly testified he believed the bulge was concealing a gun based on "where the location is and how the shirt is sort of outlining the back end of the gun as it's caught on it." (Tr. 19:2–4.)

12

In forming a basis for reasonable suspicion, law enforcement officers may "draw on their own experience and specialized training to make inferences from and deductions about cumulative information available to them that 'might well elude an untrained person.'" *Arivzu*, 534 U.S. at 273 (internal citations omitted). Officer Michaels confirmed that he had been involved in 150 to 100 firearm investigations, approximately 50 of which involved him asking whether someone had a concealed weapons permit. (Tr. 9:6–12; 53:5–15.) The Court accords substantial weight to the observations of Officer Michaels, a trained police officer with experience in investigating and apprehending armed and dangerous individuals. More importantly, the video confirms his observations.

### b. Mr. Hawkins's Presence in a High Crime Area Merits a Modicum of Weight

The Court gives only some weight to the fact that the stop occurred in a high-crime area. "[S]imply being in an area where crime is prevalent is minimally probative in the reasonable suspicion analysis." *Wingate v. Fulford*, 987 F.3d 299, 306 (4th Cir. 2021), *as amended* (Feb. 5, 2021) (citing cases). An officer could not reasonably infer that Mr. Hawkins was armed and dangerous based solely on his presence in a high-crime area. However, a defendant's presence in a high-crime area may combine with other factors, such as the officer's observations at the scene, to form a basis for reasonable articulable suspicion. *See id.* (stating that "'factors susceptible to innocent explanation individually may suffice to form a particularized and objective basis when taken together'" (quoting *United States v. Slocumb*, 804 F.3d 677, 682 (4th Cir. 2015) (internal quotation marks and brackets omitted). Accordingly, even given the fact that the officers were deployed because of recent shootings in the area, the Court accords a modicum of weight to this additional basis for Officer Michaels's reasonable suspicion that Mr. Hawkins was carrying a concealed weapon.

13

### c. The Time of the Stop Merits Some Weight

The Court assigns very little, if any, weight to the fact that the stop occurred shortly before midnight. (Tr. 13:5–10.) Without more, a traffic stop occurring at night "does little to suggest criminal activity." *Wingate*, 987 F.3d at 306 (discussing traffic stop that occurred at 1:39 a.m.). An early-morning stop could "alert a reasonable officer to the possibility of danger," entitling this factor to some weight under the totality of the circumstances, but given that the video displays a relatively uncrowded street, the Court does not rely on this factor above a modest degree. *United States v. George*, 732 F.3d 296, 300 (4th Cir. 2013).

### d. The Totality of the Circumstances Gave Rise to Reasonable Articulable Suspicion that Mr. Hawkins was Armed and Dangerous

Under the totality of the circumstances, Officer Michaels had reasonable articulable suspicion that Mr. Hawkins was carrying a concealed weapon illegally. Shortly before midnight while on patrol in a high-crime area, he observed Mr. Hawkins walking down the sidewalk toward him and three other officers with an unusual bulge at his right hip. Officer Michaels credibly testified he believed was concealing a gun based on "where the location is and how the shirt is sort of outlining the back end of the gun as it's caught on it," and the body camera confirms the awkward shape of the object under Mr. Hawkins's shirt, even to a lay observer. (Tr. 19:2–4.) The video of the encounter is consistent with Officer Michaels's testimony, plainly showing an awkwardly shaped bulge under Mr. Hawkins's shirt that is larger than a cell phone or a wallet. (Gov. Ex. 1, at 23:45:56.) Together, these circumstances would justify an officer in Officer Michaels's position to reasonably suspect that Mr. Hawkins was armed and dangerous.

Accordingly, Mr. Hawkins did not meet his burden to prove by a preponderance of evidence that the RPD officers violated his Fourth Amendment rights by stopping him.

14

### III. Conclusion

For the foregoing reasons, the Court will DENY Mr. Hawkins's Motion to Suppress. (ECF No. 18.)

An appropriate Order shall issue.

Date: 6/12/25  
Richmond, Virginia

/s/  
M. Hannah Lauck  
United States District Judge

15